UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KATHERINE LeDOUX,

      Plaintiff,           CIVIL ACTION

      v.                      NO. 1:05-CV-2621-CAP

AGL RESOURCES, INC.,

      Defendant.

O R D E R

This matter is before the court on the defendant's motion for summary judgment [Doc. No. 78]. For the reasons set forth below, the motion [Doc. No. 78] is GRANTED.

Factual Background

I.   LeDoux's Employment with AGL and her Termination

AGL, whose headquarters are located in Atlanta, Georgia, distributes natural gas to customers in Georgia, New Jersey, Virginia, Florida, Tennessee, and Maryland. For the time period related to this litigation, the relevant management hierarchy of AGL was as follows: Paula Rosput Reynolds was the Chief Executive Officer of AGL; Beth White Reese was Vice President and Controller; Brian Little was Director of Corporate Accounting from sometime in 1999 until he was promoted to Assistant Controller in November 2000; Tina Taylor was Supervisor of Customer Accounting from 1985 until late 2000 when she was promoted to Manager of Customer and Vendor Accounting Services; and Joyce Dison was a Senior Accounting

Specialist until January 2001 when she was promoted to Supervisor of Customer Accounting Services.

As Vice President and Controller, Reese was responsible for, among other things, ensuring the accuracy of the financial statements, overseeing the closing of the general ledger on a monthly basis, and regularly meeting with certain employees to ensure that their departments were operating efficiently.  As Assistant Controller, Little was responsible for closing the general ledger on a monthly basis, providing payroll services, processing accounts payable, and collecting accounts receivable. Little reported to Reese during all times relevant to this litigation.

As Manager of Customer and Vendor Accounting Services, Taylor managed accounts payable, centralized billing, revenue reporting, accounts receivable, and other related customer business.  Taylor reported to Little from late 2000 until approximately September 2001, at which time she began reporting directly to Reese while Little was assigned to a temporary project.  As Supervisor of Customer Accounting Services, Dison was responsible for managing the day to day operations of the department, including the supervision of employee performance.  At all relevant times, Dison reported to Taylor.

2

Katherine LeDoux began working for AGL on November 3, 1969, as a clerk in the accounting department.  In the early 1990s, LeDoux was promoted to Accounting Specialist by John Briggs, her supervisor at the time.  When AGL introduced computers in the 1990s, the company offered LeDoux the same training opportunities offered to her coworkers, but LeDoux failed to develop certain computer skills, and her supervisor, Taylor, noted in her August 2000 review of LeDoux that she had not taken advantage of certain computer training that would have enabled her to take on more responsibilities within the company.  Taylor also noted in that review that LeDoux needed to be more motivated, learn more processes and procedures, and put forth more effort to be a "team player."

In November 2000, Little and Reese promoted Taylor, who was 48 years old and had been employed with AGL for 29 years, and Little instructed his direct reports (including Taylor) to implement performance improvement plans ("PIPs") for employees with performance issues.  In January 2001, Little and Reese promoted Dison, who was 52 years old and had been employed with AGL for 30 years, to Taylor's former position.  Taylor then met with Dison to discuss the potential PIPs.  Dison learned that LeDoux had received a "Needs Development" on her previous performance review and that Taylor had decided to place LeDoux on a PIP.  Dison and Taylor

agreed that LeDoux's computer skills were deficient and that she needed to improve.  One of Dison's first tasks as supervisor was to implement this PIP.

Dison was new to her supervisory job and uncomfortable implementing LeDoux's PIP.  Nevertheless, she implemented the PIP on February 28, 2001, and regularly met with LeDoux regarding her progress.  Dison states that during these meetings LeDoux was sarcastic, reluctant to support Dison, and had a generally negative attitude.  Dison took notes on these meetings and documented LeDoux's behavior, which included: her questioning whether she was the only one to have closed-door meetings with Dison; her reluctance to learn anything that she might not need, even though Dison told her that she needed to learn more than just the basics with regard to Excel, Word, and Access applications; and her refusal to speak to Dison outside of the PIP follow-up meetings.  Nevertheless, on April 1, 2001, Dison extended the original deadline of the PIP from March 31, 2001, to May 1, 2001 because a class LeDoux was taking had been scheduled late in March.

In her notes, Dison stated that LeDoux showed some improvement and that she had decided to remove LeDoux from the PIP.  But she also noted that "[m]aybe with initiative [LeDoux] will improve.  I expect it to be slow."  Based on her interactions with LeDoux during this time, Dison believed the LeDoux resented Dison and

resisted learning new skills.  Dison states that, although LeDoux had not met the PIP performance criteria, Dison terminated the PIP at this time because she felt sorry for LeDoux and hoped that the termination of the PIP would encourage LeDoux and get her going in the right direction.  LeDoux claims that she satisfactorily completed the PIP and cites to the removal form that Dison signed that states that the PIP was successfully completed.

In May 2001, Dison conducted her first interim performance reviews of her employees, including LeDoux.  On May 10, 2001, LeDoux received an overall rating of "Fully Satisfactory," but an indication that she needed to "put forth more effort to be a team player" and a "Needs Development" rating on her individual performance objectives relating to "chargeable work and appliance repair payment."  LeDoux received the "Needs Development" rating because she performed only the manual portions of the chargeable work and would have to learn to perform billing in PeopleSoft, which would not be a manual process.  LeDoux refused to sign this performance evaluation due to the notation that she needed to be more of a "team player."

In July 2001, LeDoux began receiving training from David Hendrix on how to perform billing in PeopleSoft.  Hendrix informed Dison that LeDoux was "confrontational" with him and that he believed that LeDoux did not understand the basic concepts related

to navigating and using the PeopleSoft application. LeDoux denies that she was confrontational, but she does not deny that Hendrix made such a report to Dison.

On Monday, September 17, 2001, LeDoux began a vacation that she had rescheduled without Dison's approval. Dison learned that LeDoux had taken the vacation without advance approval when on September 17 or 18, 2001, Linda Hill, one of LeDoux's coworkers, told Dison that LeDoux was on vacation and that LeDoux had given her time sheet to Hill the previous Friday. Dison states that she believed that LeDoux did not like reporting to her and that LeDoux's unapproved vacation was not an oversight but instead an intentional act of insubordination. LeDoux claims that she mistakenly believed that Dison had seen the vacation changes she had posted on a shared file and that her failure to get approval of the vacation was inadvertent and not intentional. Regardless, LeDoux does not dispute that her change in vacation was not approved by Dison as required by AGL's procedures.

On Friday, September 21, 2001, Dison and Taylor met with Reese and explained to Reese that LeDoux had taken unauthorized vacation. Dison and Taylor explained to Reese that they believed, based on Dison's notes and their personal observations, that: LeDoux resisted Dison's supervision; she had a sarcastic demeanor towards Dison; she was a poor performer who did not seem to grasp the

6

relevant computer programs; and her taking of vacation without
permission was an overt act of defiance against Dison.  LeDoux
denies that Dison and Taylor discussed these issues with Reese, but
she does not deny that the meeting took place.  LeDoux cites to
deposition testimony where Reese states that she did not ask Dison
and Taylor whether LeDoux had any prior disciplinary problems.  The
court finds that this testimony does not controvert Dison and
Taylor's testimony that they did discuss the above issues.

After hearing from them, Reese asked Taylor and Dison if
LeDoux was "worth saving," and, after discussing it with one
another, they responded that she was not.  Therefore, Ledoux was
terminated on Monday, September 24, 2001.

In January 2002, AGL hired Margaret English, who was 47 years
old at the time, to replace LeDoux.  English had previously worked
for AGL from December 18, 1972, through July 2000.  Importantly,
when she was rehired in 2002, English received credit towards her
retirement benefits for her more than 27 previous years of service
to AGL.

II.  AGL's Retirement Benefits

    A.  Retiree Medical Benefits

Like many companies, AGL provides eligible retirees with
medical benefits.  To be eligible for retiree medical benefits, an
employee must be at least 55 years old and have at least 10

7

continuous years of service with AGL unless the employee's job was eliminated at age 52 and the employee signed AGL's severance agreement.

AGL's employee and retiree medical plan is funded from AGL's operating account. AGL's liability associated with its retiree medical plan is determined by an actuarial computation of future claims. The actuary bases the determination of AGL's liability on the plan itself, AGL's employee population, and statistical assumptions regarding AGL's workforce as a whole. For retirees under the age of 65, AGL's average medical costs are $7,000 per year. For retirees over 65, AGL's average medical costs are $1,400 per year. The costs associated with retiree medical benefits are paid out of AGL's operating fund.

Because costs associated with employee and retiree medical plans have risen astronomically in the past decade, various members of AGL's management, including, Reynolds, Reese, Little, and Tom Atwood, the Director of Employee Benefits, have discussed methods to limit or reduce these costs. The termination of AGL employees as a means for saving retirement costs was not discussed at any of the meetings attended by Atwood. Discussions among AGL's upper management attended by Atwood about limiting or reducing retirement costs focused solely on making appropriate changes to the plans themselves.

8

As a result of the costs discussions, AGL implemented the following changes to its employee and retiree medical plans: (1) employees and retirees were asked to a pay a larger percentage of the premium; (2) the co-pay for prescriptions was raised; (3) the chiropractic benefit was reduced; and (4) the dental plan became voluntary.

According to Atwood, terminating a single employee or even several employees would not have a recognizable effect on the valuation of AGL's employee and retiree medical plan because the plan's valuation includes the assumption that some people will be terminated during any given year.  LeDoux, however, contends that terminating a single employee, who would otherwise be eligible for early retirement medical benefits, saves the company $7,000 per year.

B.   <u>Pension Benefits</u>

In addition to retiree medical benefits, AGL also provides pension benefits to eligible employees.  An employee becomes vested in AGL's pension plan after working at AGL for five years.  Once an employee is vested in the pension plan, the employee has deferred vested benefits until she reaches the minimum age of 55.  At age 55, the employee with deferred vested benefits can begin receiving pension benefits under the pension plan regardless of whether the

employee is still employed by AGL.  An employee who is employed by AGL when she reaches age 55 receives additional pension benefits.

In June 2000, AGL changed its formula for calculating pensions for new employees.  Pensions for employees hired before January 1, 2001, were calculated by looking at the last five years of their pay.  Under the new plan, pensions for employees hired after January 1, 2001, are calculated using a career average formula.  Although this new formula is less generous for employees who stay with AGL for their entire career, it did not affect AGL's pre-existing long-term employees such as LeDoux.

Approximately one year later, largely because of the downturn in the stock market following September 11, 2001, AGL's pension plan became underfunded.  As a result, various members of management met to discuss funding the pension plan.  According to Atwood, the termination of AGL employees was not discussed at any of these meetings.  AGL ultimately made cash payments in 2002, 2003, and 2004, to keep the pension fund fully funded.

Like the retiree medical plan, the valuation of AGL's pension plan is computed by AGL's actuary.  The actuary bases the determination of AGL's liability on the plan itself, statistical assumptions regarding AGL's employee population, the discount rate, and the market performance of the plan assets.  Two major

components that affect AGL's pension expenses[1] are the discount rate and the market performance of plan assets.  The assumptions regarding AGL's employees are the least influential factor related to the valuation of AGL's pension plan.  Atwood testified that, in order to decrease pension liabilities through manipulating personnel, AGL would have to effectuate a large reduction in force, as opposed to simply eliminating one position.

Because the valuation performed by AGL's actuary assumes a certain amount of turnover in any given year, AGL claims that terminating a single employee or even several employees would not have a recognizable effect on the valuation of AGL's pension plan. LeDoux, however, disputes this characterization.  As AGL admits, longevity of employees is one of the factors contributing to pension fund liabilities.  Every year that an employee works at AGL increases the pension liability for AGL.  It therefore costs AGL more if an employee can take early retirement when the employee is terminated than if the employee is simply vested in the pension plan but ineligible for retirement.

---

[1] LeDoux notes that she does not understand what AGL means by "expenses."  LeDoux argues that expenses in the sense of money paid out in pensions are not affected by market performance or the discount rate.   Instead, these expenses are affected by demographics and the amount of pensions the eligible retirees have earned.

11

Nevertheless, Reese testified that she had never been directed to terminate older workers and was not aware of any directive to eliminate jobs to save costs related to AGL's benefits.   In addition, Reese testified that she did not believe that terminating an individual employee would reduce the costs of retiree benefits for her department or the company as a whole.   In fact, retiree benefits were not included in Reese's department budget.

LeDoux questions the veracity of Reese's testimony.   She points out that Reese acknowledges that she was conscious of the financial strain caused by the growing number of retirees and the fact that changes to the pension plan may be necessary.   LeDoux further observes that a component of an AGL manager's bonus is tied to the company's profits and the manager's ability to meet budget expectations.[2]

LeDoux also points out that Reynolds, AGL's president, conducted several "Meet-The-President" meetings wherein Reynolds remarked that 25% of AGL's employees would become eligible for retirement within the next five years.  Reynolds testified that she mentioned this fact because it created a need to develop talent to replace these future retirees.

---

[2] LeDoux also notes that Little was aware that retiree costs were a component of the company's income statement.  There is no evidence, however, that Little had any involvement in the decision to eliminate LeDoux's position.

LeDoux further presented evidence that in January or February 2003, Reynolds told high-level leadership within AGL that they were "living with the sins of their fathers and paying for it."  One of the topics of discussion at this meeting was the cost of insurance. Reynolds testified that she did not think she would have used that characterization, but that she has told employees that they have a solemn obligation to keep the company financially healthy in order to meet their obligations to retirees.

LeDoux also presented evidence that in April 2003, Reynolds held another "Meet-The-President" meeting where she talked about the high cost of retirement, insurance, and medical expenses.  At that meeting, Reynolds allegedly told employees that they would probably never retire from AGL.

LeDoux also claims that, at a different meeting, Reynolds allegedly asked employees with more than 20 years of experience to stand.  Reynolds then stated that they were "just there for the pizza."  Reese testified that she did not interpret any comment by Reynolds to mean that she or any executive at AGL intended to implement a policy of terminating older workers or treating them differently from younger workers.

Finally, LeDoux presented evidence that AGL managers in the department where she worked created a chart comparing the skills

and competence of its workers.   This chart included a section
listing the number of years the employee had worked for AGL.

<u>Legal Analysis</u>

I.   <u>Summary Judgment Standard</u>

Rule 56(c) of the Federal Rules of Civil Procedure authorizes
summary judgment when all "pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show there is no genuine issue as to any
material fact and . . . the moving party is entitled to judgment as
a matter of law."   The party seeking summary judgment bears the
burden of demonstrating that no dispute as to any material fact
exists.   <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 156, 90 S.
Ct. 1598, 1608 (1970); <u>see also</u> <u>Johnson v. Clifton</u>, 74 F.3d 1087,
1090 (11th Cir. 1996). The moving party's burden is discharged
merely by "'showing'-- that is, pointing out to the District Court
that there is an absence of evidence to support [an essential
element of] the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).   In determining
whether the moving party has met this burden, the district court
must view the evidence and all factual inferences in the light most
favorable to the party opposing the motion.   <u>See</u> <u>Clifton</u>, 74 F.3d
at 1090.   Once the moving party has adequately supported its
motion, the nonmovant then has the burden of showing that summary

14

judgment is improper by coming forward with specific facts showing a genuine dispute. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).

When deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only whether there is such an issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S. Ct. 2505, 2511 (1986). The applicable substantive law will identify those facts that are material. See Anderson, 477 U.S. at 247, 106 S. Ct. at 2510. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. See Id.

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. See Id. In order for factual issues to be "genuine" they must have a real basis in the record. See Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356. When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." Id. (citations omitted).

II.   <u>Application of the Summary Judgment Standard to the
      Plaintiff's Claims</u>

      A.   <u>Claims Under the Age Discrimination in Employment Act</u>

      The Age Discrimination in Employment Act, 29 U.S.C. §§ 621-
634, ("ADEA") makes it unlawful for an employer "to fail or refuse
to hire or to discharge any individual or otherwise discriminate
against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's age."  29 U.S.C. § 623(a)(1).  The class protected by
the ADEA is limited to individuals who are at least forty years of
age.  <u>Id.</u> § 631(a).

      The plaintiff bears the ultimate burden of persuading the
trier of fact that the defendant intentionally discriminated
against her.  <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024 (11th
Cir. 2000).  A plaintiff can carry this burden either by producing
direct evidence of discrimination motivating the employment
decision at issue or by producing circumstantial evidence
sufficient to allow an inference of discrimination.  <u>Id.</u>

      Direct evidence is evidence that, if believed, proves the
existence of a fact in issue without inference or presumption.
Direct evidence consists of actions or statements by an employer
reflecting a discriminatory attitude that correlates to the
discrimination complained of by the plaintiff.  <u>Carter v. Three</u>

<u>Springs Residential Treatment</u>, 132 F.3d 635, 641 (11th Cir. 1998). Such evidence must indicate that the complained-of employment decision was actually motivated by the employer's animus.  <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1358-59 (11th Cir. 1999).  As a result, only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a particular characteristic, constitute direct evidence of discrimination.  <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1081 (11th Cir. 1990) (stating that "[o]ne example of direct evidence would be a management memorandum stating, 'Fire Earley--he is too old'").  If evidence merely suggests, but does not prove, a discriminatory motive, then it is by definition circumstantial evidence.  <u>Burrell v. Board of Trustees of Georgia Military College</u>, 125 F.3d 1390, 1393 (11th Cir. 1997).

Absent direct evidence of discrimination, a plaintiff may prove her case through circumstantial evidence, using the burden shifting framework articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1825 (1973).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  One method a plaintiff can use to establish a prima facie case is to show that she: (1) is a member of the protected class, (2) was subjected to an adverse employment action, (3) was qualified to do the job, and (4) was

replaced or otherwise lost a position to a person outside the protected class. Chapman, 229 F.3d at 1024. Alternatively, the fourth element may be satisfied if a plaintiff shows that she was treated less favorably than similarly situated employees outside the protected class. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

A plaintiff's establishment of the four McDonnell Douglas elements is significant for two reasons: first, it creates a presumption of unlawful discrimination that the employer must rebut or lose as a matter of law; and second, it means that the plaintiff has presented evidence allowing a reasonable trier of fact to infer unlawful discrimination. Carter, at 642-43. The burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Chapman, 229 F.3d at 1024. Ultimately, the employer's burden is one of production, rather than persuasion, and it can involve no credibility assessment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000). Thus, it is sufficient if the employer's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. Chapman, 229 F.3d at 1024.

If the defendant employer articulates one or more legitimate, nondiscriminatory reasons for the challenged employment action, the

presumption of discrimination is eliminated.  The plaintiff then has the opportunity to come forward with evidence, including the previously produced evidence establishing a prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  <u>Id.</u>  The plaintiff must ultimately prove by a preponderance of the evidence that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  <u>Reeves</u>, 530 U.S. at 143, 120 S. Ct. at 2106.

Finally, the court recognizes that questions of fact in employment discrimination cases are both sensitive and difficult and that there is seldom eyewitness testimony to the employer's mental processes.  However, the Eleventh Circuit has cautioned that trial courts should not treat discrimination differently from other ultimate questions of fact.  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." <u>Chapman</u>, 229 F.3d at 1026.

1.   <u>Establishment of a prima facie case</u>

Because LeDoux has not presented any direct evidence of age discrimination, the <u>McDonnell Douglas</u> analysis applies. As noted above, in order to make out a prima facie case of age discrimination, a plaintiff must usually show that she: (1) was

19

over forty and, thus, a member of the class protected by the ADEA;
(2) was qualified for the position; (3) was subjected to an adverse
employment action; and (4) was either replaced by a significantly
younger individual or was treated less favorably than similarly
situated employees who were significantly younger.  See Chapman,
229 F.3d at 1024; see also Maniccia, 171 F.3d at 1368.

     In this instance, LeDoux has established that she was in the
age group protected by the ADEA, that she was qualified for her
job, and that she suffered an adverse employment action in being
terminated.  AGL, nonetheless, argues that LeDoux cannot establish
the fourth prong of her prima facie case.  Specifically, AGL points
out that LeDoux was replaced by an employee, Margaret English, who
was 47 years old at the time she was hired and only three years and
ten months younger than LeDoux.  According to AGL, given this
minimal age difference, LeDoux was replaced by an insignificantly
younger employee.  LeDoux responds by arguing that, even if her
replacement was not significantly younger than her, she can
establish her prima facie case by showing that a comparator
employee, Beverly Davis, was similarly situated but treated
differently than LeDoux.  AGL, however, argues that LeDoux has
failed to demonstrate that Davis and LeDoux were similarly situated
because the nature of their misconduct was significantly different.

20

The court agrees with AGL that LeDoux cannot establish a prima facie case because she cannot fulfill the fourth prong of the McDonnell Douglas analysis.  First, LeDoux cannot establish that she was replaced by someone who was substantially younger than herself.  An inference that an employment decision was based on an illegal discriminatory reason "cannot be drawn from the replacement of one worker with another worker insignificantly younger." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-13, 116 S. Ct. 1307, 1310 (1996); see also Baker v. Sears, Roebuck & Company, 903 F.2d 1515, 1520 (11th Cir. 1990) (affirming district court's holding that a plaintiff can establish this prong of her prima facie case if she shows that she was replaced by a substantially younger person).

As the court noted above, English was 47 years old at the time she was hired to replace LeDoux, and LeDoux was 51 years old, which makes English less than four years younger than LeDoux.  AGL argues that, given that she was less than four years younger than LeDoux, English was not substantially younger than LeDoux.  Citing Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997), in which the Eleventh Circuit held that a replacement who was only three years younger was sufficient to make a prima facie case of discrimination, LeDoux argues that the age difference between her and English is sufficient to establish that English was

21

substantially younger than her.  LeDoux also argues that AGL's argument implies that there is a general rule that three years can never be a substantial age difference between employees, but according to Carter and Damon, 196 F.3d at 1360 (which cited Carter in holding that a five-year age difference was sufficient for a prima facie case), LeDoux argues that a three-year age difference may be sufficient for establishing a prima facie case of age discrimination depending on the relative ages of the two people. AGL responds by arguing that, in this case, the court should find that the English is not substantially younger than LeDoux because both are within the protected class.

As one district court has stated in an order affirmed in its entirety by the Eleventh Circuit, "The establishment of a prima facie case is a factual question evaluated in light of the particular circumstances of a given case." Baker, 903 F.2d at 1520. The court recognizes that the Supreme Court in O'Connor held that the relevant criterion is whether the replacement worker is substantially younger than the plaintiff and not whether the replacement worker was outside of the protected class; therefore, AGL's specific argument is unavailing. However, as LeDoux recognizes in her brief, "The age gaps that will support a showing that an employee is 'substantially older' may vary with the relative age of the parties." Plaintiff's Response Brief at 4, n.1

22

[Doc. No. 132].  In <u>Carter</u>, the plaintiff was 42 years old and was replaced by an employee who was 39 years old.  <u>Carter</u>, 122 F.3d at 1003.  Under those facts, the Eleventh Circuit held that the plaintiff established her prima face case.  In this case, LeDoux and English were separated by a similar age difference of three years and ten months, but English was 47, and LeDoux was 51.  Thus, LeDoux and English were substantially older than the people in <u>Carter</u>.  Thus, the court finds that <u>Carter</u> is distinguishable from the case at hand, and the court holds that English is not substantially younger than LeDoux.  For these reasons and on the particular facts of this case, the court holds that English was not substantially younger than LeDoux given that she was in her late forties (47 years old) at the time she was hired and LeDoux was in her early fifties (51 years old, which makes English less than four years younger than LeDoux).

Next, the court holds that LeDoux has failed to establish her prima facie case on the basis that AGL disparately disciplined her as compared to Beverly Davis because the court finds that the nature of the misconduct between the two employees was not of comparable seriousness.  Beverly Davis was an accounts payable clerk in charge of entering invoices.  LeDoux contends that Davis had performance and attendance issues comparable to LeDoux, yet Davis was not terminated and LeDoux was.  AGL argues, however, that

Davis worked in a different department, reported to a different immediate supervisor, and was not insubordinate as LeDoux was, and, therefore, she is not comparable to LeDoux.

In McDonald v. Santa Fe Trail Transportation Company, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 2580 n.11 (1976), the Supreme Court stated that the relevant inquiry in determining whether employees had been disparately disciplined is whether the employee or employees in the non-protected class engaged in behavior of comparable seriousness as compared to those in the protected class but were not treated similarly:

> Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in McDonnell Douglas, an allegation that other "employees involved in acts against (the employer) of [c]omparable seriousness . . . were nevertheless retained . . ." is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.

Since the Supreme Court's decision in McDonald v. Santa Fe Trail, the Eleventh Circuit has held, "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Importantly, the Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be

nearly identical to prevent courts from second-guessing employers'
reasonable decisions and confusing apples with oranges." Maniccia,
171 F.3d at 1368-69.

There is some dispute as to whether Davis and LeDoux were in
comparable employee positions and had comparable performance
evaluations. Nevertheless, assuming for the purposes of this
motion that Davis and LeDoux were similarly situated with regard to
their performance evaluations and with regard to their positions
within AGL, the court holds that their misconduct was not of
comparable seriousness. It is uncontested that Davis had an
attendance problem and that she was placed on a PIP because of it.
LeDoux, on the other hand, was repeatedly resistant to Dison's
supervision, and on September 17, 2001, she changed her vacation
schedule without Dison's permission even though such permission was
required. LeDoux attempts to characterize her unauthorized
vacation as an "attendance problem" and then argues that she did
not have any attendance problems prior to the "vacation issue."
Therefore, according to LeDoux, her attendance problem was not as
bad as Davis's attendance problem, yet LeDoux was terminated and
Davis was retained. The court is not persuaded by LeDoux's
argument. LeDoux's insubordinate behavior cannot be characterized
as merely an "attendance problem." After all, it is not as if she
simply missed a few days of work. Instead, she repeatedly resisted

being supervised by Dison and ultimately rescheduled her vacation without seeking approval.  On these facts, the court holds that LeDoux and Davis are not comparable for purposes of LeDoux establishing her prima facie case.  Accordingly, the court holds that LeDoux has failed to establish a prima facie case of age discrimination.

      2.   <u>AGL's articulated non-discriminatory reason for its decision and the plaintiff's ultimate burden of proof</u>

Assuming that LeDoux could establish a prima facie case, the court turns to AGL's articulated legitimate, nondiscriminatory reason for the challenged employment decision.  In that regard, and as the court noted in its analysis above, AGL has presented evidence that LeDoux had performance problems and engaged in insubordinate activity, the worst of which was taking unauthorized vacation.  This is a legitimate, nondiscriminatory reason to terminate LeDoux.  Thus, the burden shifts back to LeDoux, who must prove by a preponderance of the evidence that the reason offered by AGL was not its true reason for terminating her, but instead was a pretext for age discrimination.  <u>See</u> <u>Reeves</u>, 530 U.S. at 143, 120 S. Ct. at 2106.

In order to proceed, LeDoux must show that AGL's proffered reason for her termination is not the true reason for its decision to terminate her, and "[s]he may succeed in this either directly by

persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981) (citing <u>McDonnell Douglas</u>, 411 U.S. at 804-805, 93 S. Ct. at 1825-26; <u>see</u> <u>also</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997). In this case, LeDoux argues that she can show that AGL's proffered reason was pretextual on the following grounds:  1) she was treated differently than Davis; 2) AGL did not follow its established progressive discipline policy when it terminated her; 3) LeDoux successfully completed a PIP; and 4) management at AGL displayed a discriminatory attitude towards older workers including LeDoux.

The court determines that LeDoux has not brought forward sufficient evidence to lead a rational fact finder to conclude that AGL's reasons for terminating her were merely a pretext for age discrimination.  First, for the reasons stated above, the court holds that LeDoux and Davis were not similarly situated.  The court also notes that it held above that English was not significantly younger than LeDoux.

Second, contrary to LeDoux's claims, the portion of the record cited to by LeDoux does not demonstrate that AGL had a mandatory progressive discipline policy:

| Plaintiff's Counsel: | Okay. So instead of doing PIPs, your modus operandi was to go through sort of a progressive discipline from verbal warning or counseling to written warning or counseling to suspension and then ultimately termination, right? |
|---|---|
| Taylor Answer: | Well, it would depend on what the offense was. |

Taylor Dep. at 90.

This testimony does not demonstrate that AGL had any mandatory progressive discipline policy, and the record does not reflect that Dison, Taylor, and Reese failed to follow any established policies when they decided to terminate LeDoux.

Third, though she had successfully completed a PIP, there is no dispute that LeDoux had performance issues. Even though she had successfully completed the PIP, these performance issues were coupled with her insubordinate attitude and activities, and, therefore, her successful completion of the PIP does not demonstrate that AGL's proffered reason was contextual.

As to LeDoux's fourth argument, she has not presented any evidence relevant to her termination that supports her claim that management personnel at AGL were motivated by age-based discriminatory intent. LeDoux first cites to Paula Reynolds, AGL's CEO, who allegedly stated that no one would retire from AGL in the future. But these comments were made in April 2003, almost a year

and a half after LeDoux was terminated, and, therefore, this statement has no probative value.

Furthermore, the testimony regarding upper management's comments that AGL's aging population was resistant to change and less likely to learn technology also have limited probative value. There is no evidence that these upper level managers were involved in the decision to terminate LeDoux. See Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999) ("[C]omments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous"). There is also no evidence that Dison, Taylor, or Reese heard these comments or otherwise participated in the meetings in which the comments were made. For these reasons, the court holds that LeDoux cannot establish that AGL's proffered reason for terminating LeDoux was pretextual.

Finally, the court notes that English received credit towards her retirement benefits for her more than 27 previous years of service to AGL when she was rehired. This fact strongly suggests that AGL's reason for terminating LeDoux was not pretextual and that AGL did not discriminate against LeDoux because of her age in order to save money. Since LeDoux cannot establish a prima facie case and because she cannot show that AGL's reason for firing her was pretextual, the court grants AGL's motion for summary judgment as to LeDoux's ADEA claim.

B.   <u>Claims Under the Employee Retirement Income Security Act</u>

In a case alleging unlawful discharge in violation of 29 U.S.C. § 1140 of the Employee Retirement Income Security Act ("ERISA"), a plaintiff may establish a prima facie case of discrimination by showing that: (1) she was entitled to ERISA's protection; (2) she was qualified for the position; and (3) she was discharged under circumstances that give rise to an inference of discrimination. <u>Gitlitz v. Compagnie Nationale Air France</u>, 129 F.3d 554, 559 (11th Cir. 1997)(quoting <u>Clark v. Coats & Clark, Inc.</u>, 990 F.2d 1217, 1223-24 (11th Cir. 1993)).  The ultimate inquiry in this type of case is "whether the employer had the specific intent to interfere with the employee's ERISA rights." <u>Clark</u>, 990 F.2d at 1222.  The "plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of discharge." <u>Id.</u> at 1222-23.

To demonstrate that she was discharged under circumstances that give rise to an inference of discrimination, LeDoux "must introduce evidence that suggests interference with ERISA rights was a motivating factor." <u>Id.</u> at 1223-24.  LeDoux attempts to do so by citing to evidence that AGL was concerned about the rising costs of pension and medical benefits and by pointing out that AGL saved

money by terminating her because her medical and pension benefits would have become larger each year.

The court holds that the evidence offered by LeDoux would not permit a finder of fact to infer that AGL intended to interfere with LeDoux's ERISA benefits or that any such intention was a motivating factor in AGL's decision to terminate LeDoux. LeDoux has not introduced evidence sufficient to show that AGL obtained a significant reduction in benefit costs when it terminated her. See Clark, 990 F.2d at 1224 ("One way for the employee to satisfy [her] burden is to show that [her] termination resulted in a substantial savings in benefit expenses."). LeDoux was fully vested in all the benefits that she had accrued under AGL's pension plan. None of these benefits were forfeited upon termination of her employment. Although LeDoux would have received a larger benefit when she reached age 55, the age of retirement, this alone is not sufficient to infer AGL's specific intent was to interfere with her ERISA rights.[3]   See Clark, 990 F.2d at 1224 ("The plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits."). Furthermore, LeDoux would not have been

---

[3] Although the Eleventh Circuit has recognized proximity to vesting as providing enough evidence to raise an inference of intentional interference with pension rights, LeDoux would not have reached retirement age for four years.

eligible for retiree medical benefits for another four years at the age of 55, which is too remote in time to raise an inference of intentional interference with pension rights.

Finally, the court again notes that, when she was hired to replace LeDoux, English received credit towards her retirement benefits for her previous years of service to AGL.   This fact strongly suggests that it was not AGL's intent to interfere with LeDoux's ERISA benefits and that such an intention was not a motivating factor in AGL's decision to terminate LeDoux.

LeDoux also argues that the circumstances of her discharge give rise to an inference of discrimination in violation of her ERISA rights because she was only seven months away from being eligible to get early retirement and retiree medical benefits if she was severed, and severance was a real possibility because Brian Little was actively considering downsizing at the time when LeDoux was terminated.   But this is mere speculation on the part of LeDoux since there simply is no evidence that Little or anyone else in AGL was considering eliminating LeDoux's position or otherwise severing LeDoux.   Accordingly, the court grants AGL's motion for summary judgment as to LeDoux's ERISA claim.

<u>Conclusion</u>

For the foregoing reasons, the court hereby GRANTS AGL's motion for summary judgment [Doc. No. 78].  Since this order resolves all pending issues in this matter, the clerk is directed to close this file.


SO ORDERED, this <u>3rd</u> day of August, 2006.



<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge